[Cite as *Mataraza v. Euclid*, 193 Ohio App.3d 479, 2011-Ohio-2795.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95830**

## MATARAZA,

APPELLANT,

v.

## CITY OF EUCLID ET AL.,

APPELLEES.

## JUDGMENT:
## REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV- 683505

**BEFORE:** Kilbane, A.J., Cooney, J., and Keough, J.

**RELEASED AND JOURNALIZED:** June 9, 2011

**ATTORNEY FOR APPELLANT**

Bentoff & Duber Co., L.P.A.
Glen S. Richardson
55 Public Square
Suite 1200
Cleveland, Ohio 44113-1901

**ATTORNEYS FOR APPELLEES**

**For the city of Euclid**

Millison & Nobil Co., L.P.A.
Mark E. Snyder
Jason M. Baasten
9150 South Hills Boulevard
Suite 300
Cleveland, Ohio 44147

**For the Bureau of Workers' Compensation**

Mike DeWine
Ohio Attorney General
Vincent T. Lombardo
Assistant Attorney General
State Office Building - 11th Floor
615 West Superior Avenue
Cleveland, Ohio 44113-1899

MARY EILEEN KILBANE, Judge.

{¶ 1} Plaintiff-appellant, Kim Mataraza, appeals from the order of the trial court that awarded summary judgment to the city of Euclid, thereby reversing her award of workers' compensation surviving-spouse death benefits. For the reasons set forth below, we reverse the judgment and remand the cause for further proceedings consistent with this opinion.

{¶ 2} Mataraza's late husband, James Mataraza (referred to herein as "James" or "the decedent"), began working as a firefighter for the city of Euclid in 1991. On January 19, 2005, James, who was then 41 years old, suffered a fatal heart attack. Mataraza filed a request for determination of death benefits for "accident/occupational disease" with the Bureau of Workers' Compensation. According to Mataraza, James's heart disease was "caused or contributed to by the cumulative effect of exposure to heat, the inhalation of smoke, toxic gasses, chemical fumes and other substances in the performance of his duties [as a firefighter] over the prior fourteen years," and was therefore a work-related death under the rebuttable presumption codified at R.C. 4123.68(W).

{¶ 3} On January 5, 2006, the administrator of the Bureau of Workers' Compensation denied the claim, noting:

> The decedent's death did not occur in the course of and arising out of employment. The employee was not on property owned or controlled by the employer. * * * There is no medical documentation to indicate the death was caused by employment.

{¶ 4} Mataraza appealed the administrator's decision to the district hearing officer ("DHO"). Following a hearing on September 14, 2006, the DHO concluded that the "[d]eceased claimant was a firefighter who died from atherosclerotic heart disease. Per Ohio Revised code 4123.68, the claim is referred for qualified medical specialist review.

{¶ 5} Dr. Alan Kravitz, Euclid's expert, and Dr. Haridas Biswas, Mataraza's expert, subsequently reviewed the matter. Following a second hearing before the DHO on January 8, 2007, the DHO concluded:

> It is the finding of the District Hearing Officer that the date of diagnosis is 01/19/05 [the date of James's death]. Employment [sic].
>
> District Hearing Officer finds decedent's occupation as a firefighter to be a contributing factor to the decedent's coronary artery disease and myocardial infarction resulting in death per Dr. Kravitz review dated 09/16/2006 and the 12/01/2006 [Dr. Haridas] Biswas review.
>
> District Hearing Officer further finds the surviving spouse Kimberly Mataraza to be wholly dependent upon decedent for support at the time of death * * *.

{¶ 6} Euclid appealed this decision to a staff hearing officer ("SHO"). The SHO heard the matter on March 9, 2007, and on March 13, 2007, the SHO affirmed the award of surviving-spouse death benefits.

{¶ 7} Euclid filed a further appeal on March 19, 2007, and on April 10, 2007, the SHO released the following decision:

[I]t is ordered that the Appeal filed 03/19/2007 by the Employer from the order issued 03/13/2007 by the Staff Hearing Officer be refused and that copies of this order be mailed to all interested parties.

This appeal was reviewed by two Staff Hearing Officers on behalf of the Commission. Both Staff Hearing Officers concur with this decision.

{¶ 8} Euclid filed an appeal to the court of common pleas on April 10, 2007, which was subsequently dismissed. On February 2, 2009, a new complaint was filed in the matter.

{¶ 9} On May 4, 2010, Euclid filed a motion for summary judgment. Euclid acknowledged that R.C. 4123.68 creates a rebuttable presumption that when a firefighter suffers cardiovascular, pulmonary, or respiratory disease, the disease occurs in the course of and arising out of his employment where it is caused or induced by the cumulative effect of exposure to heat, the inhalation of smoke, toxic gases, chemical fumes, and other toxic substances in the performance of his duty. Euclid maintained, however, that James had cardiovascular disease prior to becoming a firefighter, and that the aggravation of this preexisting disease is not compensable.

{¶ 10} In support of its motion, Euclid submitted the April 14, 2010 report of Dr. Kravitz that states as follows:

I believe Mr. Mataraza's death was secondary to his duties as a firefighter. These are arduous work, working in an active fire, superheated flames, dragging heavy hoses and the like. Indeed, it is a time when a firefighter is fearful for his very life. It is certain [James] had atherosclerosis prior to any fire-fighting due to his family history and hyperlipidemia (high cholesterol). His cholesterol was extraordinarily high at 269, his LDL, or bad

cholesterol, at 197 (nl less than 80). The descriptions I have referred to of his occupation as a firefighter are indeed stressful and accordingly aggravated the preexisting conditions stated. * * * Specifically, his infarction was predetermined, but for a time later in life were it not for his occupation. The thrombosis in his left anterior descending artery was in fact the cause of his infarction although it manifested itself (although present) days before. The coroner's report shows severe atherosclerosis, 90% occlusion with acute plaque rupture and thrombosis clot in the left anterior descending arteries with resultant recent myocardial infarction. I have described in great detail the chores of a firefighter. They are certainly different from those of an average worker. In addition to the statements above, there is a very high degree of stress associated with this job. Such stress is known to make platelets 'sticky' or aggregate, which caused the occlusion.

* * * It is my opinion to a reasonable degree of medical certainty and probability that the sequence of events, i.e., aggravation of pre-existing condition, is directly and proximately related to his work as a firefighter.

{¶ 11} In opposition, Mataraza asserted that there are genuine issues of material fact as to whether she is entitled to compensation: (1) Did James have preexisting heart disease at the time he was hired as a firefighter at age 27? and (2) Was James's fatal heart attack an injury occasioned by stress experienced in the course of and arising out of his employment? Mataraza noted that prior to becoming a firefighter, James had never been diagnosed with cardiovascular disease. In addition, James passed his 1991 preemployment physical, and there was no finding of cardiovascular disease at that time.

{¶ 12} Mataraza cited the April 14, 2010 report of Dr. Kravitz, quoted above, and also presented the December 1, 2006 report of Dr. Biswas, which stated:

1.  The claimant's death and autopsy report suggests that the patient had coronary artery disease.  It appears that the patient's death was due to sequelae of the patient's coronary atherosclerosis.  This appears to be preexisting conditions [sic] in terms of the timing of death.  There is no direct causation of his death as a firefighter for City of Euclid.

2.  The patient definitely had preexisting atherosclerotic heart disease but the duration is not known.  Normally, coronary artery disease or atherosclerotic cardiovascular disease is a multifactorial disease.  The risks of the disease include a lot of significant diseases including hypertension, diabetes mellitus, hyperlipidemia, and coronary artery disease as well as stress factors.  Although his death was not directly related to his duty as a firefighter, there were aggravations related by his duty in terms of significant stress and exposure to other harmful chemicals, etc.

3.  I do not feel that the aggravations from his job duties were a direct causation of his death.  As mentioned above, the coronary artery disease has multiple risk factors including the job duties and activities as well as stress, but it is not the total or only aggravating risk factors for his death.

4.  The coroner's report indicated the patient had a fatal disease with significant myocardial infarctions and acute myocardial infarctions.  The patient also had significant atherosclerotic heart disease.  The report indicated immediate causes of the patient's death.  However, as mentioned above, I feel the combination of multiple factors was coronary atherosclerosis which has multiple risk factors as mentioned above and the stress of the job duties as a firefighter was significant and that is one of the aggravating risk factors.

However, because of the lack of the patient's previous medical history including the status of multiple risk factors for coronary artery disease, it is not possible at this time to determine what percent of the patient's ultimate demise or death was the result of the patient's job stress.

{¶ 13} Euclid filed a reply brief.  With regard to the claim for recovery for a cardiovascular disease occurring in the course of and arising out of James's employment,

Euclid presented the May 27, 2010 report of its medical expert, Dr. Harris, who indicated that at the time he was hired, James had a number of risk factors for the potential development of coronary artery disease, including elevated cholesterol and triglyceride levels, smoking, and a family history of cardiovascular disease. Dr. Harris opined that James's "occupation as a Firefighter did not cause or contribute to the development of his coronary artery disease." Dr. Harris noted that James's work records from 1991 to 1999, or the first eight years of James's employment, were not available. Dr. Harris reviewed James's "run reports" from 1999 to 2005, and noted that of the 129 incident reports, 34 were runs to active fires, but there was no evidence that James "inhaled smoke or any other noxious fumes on any of these occasions."

{¶ 14} With regard to the claim for an injury occasioned by stress experienced in the course of and arising out of his employment, Euclid asserted that Mataraza had not alleged an "occupational injury" during the administrative proceedings. Alternatively, Euclid asserted that James had been home on vacation leave in the eight days prior to his death and that Mataraza could not identify a job-related stressful incident related to James's fatal heart attack.

{¶ 15} On September 14, 2010, the trial court determined that Euclid was entitled to judgment as a matter of law and entered summary judgment in favor of Euclid and the administrator of the Bureau of Workers' Compensation. Mataraza now appeals and assigns the following error for our review:

> The pleadings and the medical expert's reports reveal several genuine issues of material fact that should have gone to the jury.

{¶ 16} Within this assignment of error, Mataraza argues that James had never been diagnosed with cardiovascular disease prior to his employment as a Euclid firefighter. During his employment, however, James responded to hundreds of emergency calls that potentially exposed him to harmful fumes, dust, and smoke. She therefore asserts that there are genuine issues of material fact as to whether James developed cardiovascular disease in the course of and arising out of his employment. Mataraza additionally maintains that James's occupation brought on a great deal of stress unlike that experienced by other workers, and therefore, there are genuine issues of material fact as to whether James's heart attack was an "acute event" or compensable injury that was brought about by job-related stresses.

{¶ 17} With regard to procedure, we review the grant of summary judgment de novo using the same standards as the trial court. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684. A trial court may not grant a motion for summary judgment unless the evidence before the court demonstrates that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. See, e.g., *Vahila v. Hall (1997)*, 77 Ohio St.3d 421, 429-430, 674 N.E.2d 1164.

{¶ 18} The burden of showing that no genuine issue exists as to any material fact falls upon the moving party in requesting a summary judgment. Id., citing *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Vahila*.

{¶ 19} In responding to a motion for summary judgment, the nonmoving party may not rest on unsupported allegations in the pleadings. Civ.R. 56(E); *Harless*. Rather, Civ.R. 56 requires the nonmoving party to respond with competent evidence that demonstrates the existence of a genuine issue of material fact for trial. *Vahila*. Summary judgment, if appropriate, shall be entered against the nonmoving party. *Jackson v. Alert Fire & Safety Equip., Inc.* (1991), 58 Ohio St.3d 48, 52, 567 N.E.2d 1027.

{¶ 20} In this matter, we must determine, under the de novo standard of review of the record, if there are genuine issues of material fact as to (1) whether James developed cardiovascular disease in the course of and arising out of his employment and (2) whether James's heart attack was an acute event or compensable injury that was brought about by the stresses of his occupation as a firefighter.

### Did James Develop Cardiovascular Disease in the Course of and Arising out of His Employment?

{¶ 21} R.C. 4123.68 states:

The following diseases are occupational diseases and compensable as such when contracted by an employee in the course of the employment in which such employee was engaged and due to the nature of any process described in this section.   * * *

* * *

(W)   Cardiovascular, pulmonary, or respiratory diseases incurred by fire fighters or police officers following exposure to heat, smoke, toxic gases, chemical fumes and other toxic substances: Any cardiovascular, pulmonary, or respiratory disease of a fire fighter or police officer caused or induced by the cumulative effect of exposure to heat, the inhalation of smoke, toxic gases, chemical fumes and other toxic substances in the performance of his duty constitutes a presumption, which may be refuted by affirmative evidence, that such occurred in the course of and arising out of his employment.   For the purpose of this section, "fire fighter" means any regular member of a lawfully constituted fire department of a municipal corporation or township, whether paid or volunteer, and "police officer" means any regular member of a lawfully constituted police department of a municipal corporation, township or county, whether paid or volunteer.

{¶ 22} In *Cunningham v. Conrad* (Mar. 31, 1999), Summit App. No. 19187, the court explained this statute as follows:

Cardiovascular disease is a recognized occupational disease for firefighters repeatedly exposed to heat, smoke, chemical fumes, and other toxic substances. R.C. 4123.68(W).   Determination that the cardiovascular disease of a specific firefighter was contracted in the course of employment is a two-part process.   See id.   [Citing R.C. 4123.68(W)].   First, the firefighter must establish that the disease was "caused or induced by" the cumulative exposure to the toxins designated by statute.   Id.   Once the firefighter has shown causation, a refutable presumption arises that such exposure, and the resulting disease, occurred 'in the course of and arising out of his employment.'

{¶ 23} The *Cunningham* court further explained:

The presumption which arises is not that all cardiovascular disease in firefighters is caused by or arises out of their work, but that *if* it is shown that cardiovascular disease in an individual is caused by cumulative exposure to things which firefighters normally encounter in their line of work that the causative exposure occurred at work, rather than elsewhere. The phrase "in the performance of his duty" must be read as modifying only "other toxic substances,' because to read it as modifying the entire list would render completely redundant the presumption that the exposure or causation occurred at work. Under the canons of statutory construction, a statute is to be read in a way that gives meaning to each word or phrase, rather than making some of them redundant.

(Emphasis sic.) *Cunningham*, citing *E. Ohio Gas Co. v. Pub. Util. Comm.* (1988), 39 Ohio St.3d 295, 299, 530 N.E.2d 875.

{¶ 24} Euclid asserts that based upon his family history and hyperlipidemia, James suffered from cardiovascular disease prior to becoming a firefighter. Euclid therefore asserts that the presumption of R.C. 4123.68 is inapplicable because aggravated preexisting diseases are not contracted by the employee in the course of employment. In opposition, Mataraza notes that prior to becoming a firefighter, James had never been diagnosed with cardiovascular disease, he had had high cholesterol, but no symptoms of cardiovascular disease, he was never treated by a doctor for this condition, and he passed his preemployment physical examination. Mataraza therefore maintains that there is a genuine issue of material fact as to whether James contracted cardiovascular disease from firefighting.

{¶ 25} As an initial matter, we must address the premise of Euclid's argument that aggravated preexisting diseases are not compensable. In *Brody v. Mihm* (1995), 72 Ohio St.3d 81, 647 N.E.2d 778, the Ohio Supreme Court held that "claims for aggravation of a

pre-existing disease are compensable only where the aggravation itself qualifies as a compensable injury or occupational disease." Id. at 83.

{¶ 26} The *Brody* court explained:

> In *Oswald* [*v. Connor* (1985), 16 Ohio St.3d 38, 476 N.E.2d 658] we held that "death from a pre-existing cause and accelerated *by an occupational disease* contracted in the course of and arising out of the scope of employment, is compensable * * *." (Emphasis added.) This holding was simply an extension of case law decided prior to [*State ex rel.*] *Miller* [*v. Mead Corp.* (1979), 58 Ohio St.2d 405, 390 N.E.2d 1192.] Prior to *Miller*, we had held that death or disability resulting from a pre-existing cause or disease and accelerated *by an injury*, in the course of and arising out of employment, is compensable. *Swanton v. Stringer* (1975), 42 Ohio St.2d 356, 71 O.O.2d 325, 328 N.E.2d 794; *McKee v. Elec. Auto-Lite Co.* (1958), 168 Ohio St. 77, 5 O.O.2d 345, 151 N.E.2d 540. After *Oswald*, claims for aggravation of a pre-existing disease are compensable only where the aggravation itself qualifies as a compensable injury or occupational disease.

{¶ 27} The parties dispute the point at which James developed cardiovascular disease. Euclid maintains that he had it prior to becoming a firefighter, and Mataraza maintains that James passed his preemployment physical, then developed it later, with a date of diagnosis of January 19, 2005. This primary issue must be resolved prior to consideration of the issue of any aggravation of a preexisting disease. *Sheeler v. Ohio Bur. of Workers' Comp.* (1994), 99 Ohio App.3d 443, 651 N.E.2d 7.

{¶ 28} In *Sheeler*, the claimant sought workers' compensation for coronary artery disease and lung disease that he alleged were sustained in the course of and arising out of his 19-year career as a firefighter. Following the administrative denials of his claim, a jury concluded that the claimant was entitled to workers' compensation for the diseases.

{¶ 29} On appeal, the Bureau of Workers' Compensation complained that the lower court erroneously permitted the claimant to participate in the workers' compensation system for aggravation of preexisting coronary artery disease and lung disease caused by normal employment activities. The court of appeals rejected this contention and stated:

> In the case *sub judice,* there was no evidence that appellee suffered from coronary artery or lung disease prior to his employment as a firefighter with the Barberton Fire Department. Appellee proceeded at trial on the basis that firefighting caused his diseases. Appellant argued that it did not. Appellant's argument now is, in effect, that because it presented evidence that appellee possessed certain risk factors for the diseases at issue, he had a "pre-existing condition" requiring the court to give the requested instruction.
>
> "Pre-existing condition" is defined as "an illness or physical condition that exists before an insurance policy goes into effect. * * * In order for a condition to pre-exist, it must manifest itself. That means the individual knew of the condition due to prior diagnosis, or was aware of the problem * * *." Thomsett, Insurance Dictionary (1989) 159. The term "pre-existing condition' has also been defined as 'an illness, disease, accidental bodily damage or loss * * *." *DeMatteis v. Am. Community Mut. Ins. Co.* (1992), 84 Ohio App.3d 459, 461, 616 N.E.2d 1208, 1209, quoting insurance policy language.

{¶ 30} In this matter, Euclid maintained that James had preexisting cardiovascular disease, based upon the following portions of Dr. Kravitz's report:

> It is certain [James] had atherosclerosis prior to any fire-fighting due to his family history and hyperlipidemia (high cholesterol). His cholesterol was extraordinarily high at 269, his LDL, or bad cholesterol, at 197 (nl less than 80). The descriptions I have referred to of his occupation as a firefighter are indeed stressful and accordingly aggravated the preexisting conditions stated. * * *

Specifically, his infarction was predetermined, but for a time later in life were it not for his occupation.

{¶ 31} Euclid also presented the report of Dr. Harris, who opined that at the time James was hired, he had a number of risk factors for the potential development of coronary artery disease, including elevated cholesterol and triglyceride levels, smoking, and a family history of cardiovascular disease. Dr. Harris opined that James's "occupation as a firefighter did not cause or contribute to the development of his coronary artery disease."

{¶ 32} In opposition, Mataraza presented evidence that prior to becoming a firefighter, James had never been diagnosed with cardiovascular disease and, although he had had high cholesterol, he had no symptoms of cardiovascular disease, and he was never treated by a doctor for this condition. He passed his 1991 preemployment physical, and at that time, no health issues precluded him from working as a firefighter. Mataraza also presented the report of Dr. Biswas that indicated James had preexisting atherosclerotic heart disease at the time of his death but "the duration is not known," and due to "the lack of the patient's previous medical history including the status of multiple risk factors for coronary artery disease, it is not possible at this time to determine what percent of the patient's ultimate demise or death was the result of the patient's job stress."

{¶ 33} Based upon all of this information, and after conducting a de novo review, we conclude that there are genuine issues of material fact as to whether James actually had atherosclerosis prior to becoming a firefighter. Although Euclid presented the report of Dr. Kravitz, who insisted that he was "certain" that James had atherosclerosis

prior to becoming a firefighter, this was based solely upon James's family history and hyperlipidemia (high cholesterol). Plainly, however, Kravitz simply offered an opinion based upon these risk factors. There is absolutely no indication in the record to establish that James was diagnosed with atherosclerosis at the time he was hired, at the age of 27. Likewise, Dr. Harris opined that at the time he was hired, James had a number of risk factors for the potential development of coronary artery disease, including elevated cholesterol and triglyceride levels, smoking, and a family history of cardiovascular disease. Again, the presence of these risk factors do not establish that James had atherosclerosis in 1991 when he was hired. These expert opinions do not establish the existence of a preexisting disease, as the presence of risk factors alone is insufficient to establish, as matter of law, that James had preexisting cardiovascular disease. *Sheeler.* Moreover, according to Dr. Biswas, James had preexisting atherosclerotic heart disease at the time of his death but "the duration is not known."

{¶ 34} Further, Matараza presented evidence that, prior to becoming a firefighter, James had never been diagnosed with cardiovascular disease, he had never been diagnosed with cardiovascular disease, he had high cholesterol but no symptoms of cardiovascular disease, he was never treated by a doctor for this condition, and he passed his 1991 preemployment physical examination. There was no finding of cardiovascular disease and no connection that excluded him from employment. Clearly, there is no indication that it had manifested itself or that James knew about this condition at that

time, so it cannot be said, as a matter of law, that this condition existed at the time he was hired. *Sheeler*.

{¶ 35} Further, during the administrative review of this matter, the reviews conducted by the DHO and SHO concluded that James's death was due to his occupation as a firefighter.

{¶ 36} In accordance with the foregoing, we conclude that there is a genuine issue of material fact as to whether James developed cardiovascular disease in the course of and arising out of his employment. This portion of the assigned error is well taken.

## Was James's Heart Attack a Compensable Injury?

{¶ 37} Under R.C. 4123.01(C), the term "injury" "includes any injury, whether caused by external accidental means or accidental in character and result, received in the course of, and arising out of, the injured employee's employment."

{¶ 38} In *Village v. Gen. Motors Corp., G.M.A.D.* (1984), 15 Ohio St.3d 129, 472 N.E.2d 1079, the court recognized that a compensable work-related injury may be gradual and progressive, rather than sudden. In an often cited concurring opinion, Justice Holmes further explained:

> Under the "sudden mishap" test as previously recognized by this court, the determinative factor was the ability of the employee to isolate a specific event upon which to rest his claim. The practical result of this distinction was to preclude recovery in those instances where the employee could not point to an isolated, traumatic external event as the cause of his disability. In the area of injuries occasioned over a period of time while acting in the course of his employment, the burden was insurmountable in most cases for the employee as there was not a sudden occurrence but, rather, a continual degenerative condition.

* * *

A heart attack brought on by a sudden and dramatic stimulus, such as a severe muscular strain, is clearly compensable under our statute. However, closer questions are involved when the employment contribution is a more protracted burden such as worry, frustration, overwork, anxiety, and other stressful conditions. In this situation, medical testimony can never be certain that the heart failure or cerebral hemorrhage was entirely due to the employee's working environment. Thus, the factual issue of causal relationship is generally for the medical experts and the triers of fact.

{¶ 39} Later, in *Ryan v. Connor* (1986), 28 Ohio St.3d 406, 409, 503 N.E.2d 1379, the court held that physical injuries occasioned solely by emotional stress are compensable under the Ohio Workers' Compensation Act, in the same manner as physical injuries resulting from contemporaneous physical injury or physical trauma. In that case, the employee suffered a heart attack after he was informed that he had to take an early retirement. Id. at 407. The *Ryan* court recognized that although not all mental or emotional stress is legally sufficient to give rise to a compensable injury, some work-related stress can cause an injury that is compensable under workers' compensation. Id. at 409.

{¶ 40} The *Ryan* court held that in order for a stress-related injury to be compensable, the claimant must make a two-part showing. First, the claimant must show that the injury resulted from greater emotional strain or tension than that to which all workers are occasionally subjected. Id. In other words, the injury must result from "unusual" workplace stress unlike the normal, everyday stress that all workers experience from time to time. *Small v. Defiance Pub. Library* (1993), 85 Ohio App.3d 583, 587,

620 N.E.2d 879. The court must view the stress from an objective standpoint, focusing on the stress experienced by all workers as a whole, and not from the subjective standpoint of the injured worker or the worker's individualized or subjective response to the stress. Id.

{¶ 41} Second, the claimant must establish that the stress to which he (or claimant's decedent) was subjected in his employment was, in fact, the medical cause of his injury. *Ryan*. The *Ryan* court explained:

> In this regard, the claimant must show a substantial causal relationship between the stress and the injury for which compensation is sought. The claimant therefore must "show by a preponderance of the evidence, medical or otherwise, * * * that a direct or proximate causal relationship existed between * * * [the stress] and his harm or disability," *Fox v. Indus. Comm.* (1955), 162 Ohio St. 569, [55 O.O. 472] 125 N.E.2d 1, paragraph one of the syllabus; or, when death benefits are sought, that the claimant's decedent's death was "accelerated by a substantial period of time as a direct and proximate result of the * * * [stress]." *McKee v. Electric Auto-Lite Co.* (1958), 168 Ohio St. 77, 151 N.E.2d 540 [5 O.O.2d 345], syllabus.

{¶ 42} The *Ryan* court did not, however, impose a requirement that a claimant who alleges a stress-related injury prove that his injury resulted solely from the workplace stress. *Kennedy v. Toledo* (1991), 75 Ohio App.3d 12, 598 N.E.2d 839. The court explained that the basic principles of proximate causation including dual causation are applicable to stress-related injuries, so that when two factors combine to produce damage or illness, each is a proximate cause. Id.

{¶ 43} This question, i.e., "the factual issue of causal relationship[,] is generally for the medical experts and the triers of fact," and "analysis must proceed on a

case-by-case basis." Id., citing *Village,* 15 Ohio St.3d at 132, 472 N.E.2d 1079. Such factual issues include the effect that a cumulative impact has on an employee's body or a particular physical weakness. *Kennedy*.

{¶ 44} In short, where the plaintiff has presented evidence that the claimant's heart attack occurred in the course of his employment, summary judgment in favor of the employer is erroneous. *Brown v. Upper Sandusky Schools*, 139 Ohio App.3d 448, 2000-Ohio-1894, 744 N.E.2d 236.

{¶ 45} In this matter, Euclid insists that Mataraza's stress-related-injury claim is moot since she did not pursue theclaim administratively. This contention is without merit, however, as the record indicates that following James's death, Mataraza filed a request for determination of death benefits for "accident/occupational disease." Alternatively, Euclid maintains that it is entitled to judgment as a matter of law on any stress-related-injury claim because James had been home on vacation leave in the eight days prior to his death and fire-run records do not demonstrate that he inhaled smoke or noxious fumes or went to an emergency room after working a shift.

{¶ 46} In opposition, Mataraza argues that there are genuine issues of material fact as to whether the increased stress of being a firefighter caused James's myocardial infarction, thus rendering it a compensable injury.

{¶ 47} The record in this matter includes the following from the report of Dr. Kravitz:

> [Firefighting is] arduous work, working in an active fire, superheated flames, dragging heavy hoses and the like. * * * The

descriptions I have referred to of his occupation as a firefighter are indeed stressful and accordingly aggravated the preexisting conditions stated. * * * Specifically, his infarction was predetermined, but for a time later in life were it not for his occupation. * * * I have described in great detail the chores of a firefighter. They are certainly different from those of an average worker. In addition to the statements above, there is a very high degree of stress associated with this job. Such stress is known to make platelets 'sticky' or aggregate, which caused the occlusion.

* * * It is my opinion to a reasonable degree of medical certainty and probability that the sequence of events, i.e., aggravation of pre-existing condition, is directly and proximately related to his work as a firefighter.

{¶ 48} Mataraza also presented the report of Dr. Biswas, which stated as follows:

Although his death was not directly related to his duty as a firefighter, there were aggravations related by his duty in terms of significant stress and exposure to other harmful chemicals, etc.

* * *

4. The coroner's report indicated the patient had a fatal disease with significant myocardial infarctions and acute myocardial infarctions. The patient also had significant atherosclerotic heart disease. The report indicated immediate causes of the patient's death.

{¶ 49} Viewing the record in its entirety, we believe that Euclid's evidence is insufficient to establish as a matter of law that James's fatal myocardial infarction is not a compensable injury. Although Dr. Harris reviewed James's run reports, he did not have the records from James's first eight years of employment. The records from 1999 to 2005 contained 129 incident reports, and 34 were runs to active fires. According to Dr. Harris, there was no evidence that James "inhaled smoke or any other noxious fumes on any of these occasions," but this conclusion is contrary to the statutory presumption of

R.C. 4123.68(W), that a firefighter faces "exposure to heat, the inhalation of smoke, toxic gases, chemical fumes and other toxic substances in the performance of his duty."

{¶ 50} Moreover, although Euclid presented evidence that James had been on vacation immediately prior to his fatal heart attack, this does not preclude the possibility that he had experienced work-related stress for the last 14 years and that the stress ultimately caused his demise. Similarly, although James did not report to an emergency room during the course of his employment, the absence of medical treatment immediately after work does not negate the possibility of a stress-related injury or injury caused by the cumulative effect of work-related stress. Significantly, Euclid's expert did not have run records for an eight-year period. Further, Dr. Kravitz noted that James's thrombosis manifested itself days before he died, there is no explanation of the thrombosis and indication as to whether James suffered job-related stresses at that time. In short, Euclid failed to demonstrate as a matter of law that James did not suffer greater emotional strain or tension than that to which all workers are occasionally subjected, or that the stress to which he was subjected in his employment was not the medical cause of his injury, such that Mataraza is not entitled to workers' compensation benefits.

{¶ 51} In accordance with the foregoing, we conclude that there are genuine issues of material fact as to whether James's fatal heart attack was an acute event or compensable injury that was brought about by job-related stress. This portion of the assignment of error is well taken.

{¶ 52} Mataraza's assignment of error has merit. There are genuine issues of material fact as to whether (1) James developed cardiovascular disease in the course of and arising out of his employment and (2) whether James's heart attack was an acute event or compensable injury that was brought about by the stresses of his job.

{¶ 53} The judgment of the trial is reversed, and the matter is remanded for further proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

KEOUGH, J., concurs.
COONEY, J., dissents.

COLLEEN CONWAY COONEY, Judge, dissenting.

{¶ 54} I respectfully dissent. Although this is a tragic circumstance where a 41-year-old firefighter died at home after eight days on vacation, having served 14 years as a Euclid firefighter, both experts stated that his coronary artery disease was a preexisting condition. The aggravation of preexisting conditions is not compensable under Ohio's Workers' Compensation Act. *State ex rel. Miller v. Mead Corp.* (1979), 58 Ohio St.2d 405, 390 N.E.2d 1192. "In *Brody* [*v. Mihm* (1995), 72 Ohio St.3d 81, 647 N.E.2d 778], the court specifically stated that: 'The change in the definition of "injury," however, does not affect that portion of *Miller* which holds that a pre-existing disease aggravated during employment is not compensable.'" *Hottel v. Timothy L. Hottel D.D.S., Inc.* (Oct. 1, 1998), Cuyahoga App. No. 73431.

{¶ 55} I find *Sheeler v. Ohio Bur. of Workers' Comp.* (1994), 99 Ohio App.3d 443, 651 N.E.2d 7, distinguishable from the instant case. Sheeler presented an expert who testified that his diseases were the direct result of his employment as a firefighter. Id. at 452. There was no evidence that Sheeler suffered from coronary artery or lung disease prior to his employment. Id. at 449. Thus, that case did not involve the compensability of "aggravation" of an underlying illness, but rather the cause of the illness.

{¶ 56} In the instant case, Dr. Kravitz opined, "It is certain that [James] had atherosclerosis prior to any fire-fighting." Dr. Biswas agreed that James "definitely had pre-existing atherosclerotic heart disease but the duration is not known." Dr. Biswas's inability to say how long the underlying disease had existed does not rebut Dr. Kravitz's certainty that it existed prior to James's firefighting duties.

{¶ 57} Therefore, I would affirm summary judgment for the city.